Filed 12/11/13  In re S.H. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.H., a Person Coming Under the Juvenile Court Law. | B245942 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>E.H. et al.,<br><br>        Defendants and Appellants. | (Los Angeles County Super. Ct. No. CK57697) |
| J.H.,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | B248323 |

APPEAL and ORIGINAL PROCEEDINGS in mandate from orders of the Superior Court of Los Angeles County, Marguerite Downing, Judge. Orders affirmed, petition denied.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant E.H.

Catherine C. Czar, Law Office of Timothy Martella, Los Angeles Dependency Lawyers, Inc., Rebecca Harkness and Thomas Hayes, under appointment by the Court of Appeal, for Defendant, Appellant, and Petitioner J.H.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, William D. Thetford, Principal Deputy County Counsel for Plaintiff, Respondent, and Real Party in Interest Los Angeles County Department of Children and Family Services.

No appearance for Respondent Superior Court of Los Angeles County.

_____

This opinion addresses two consolidated proceedings. E.H. (mother) and J.H. (father) appeal from the juvenile court's jurisdictional and dispositional orders declaring their seventh child, S.H., a dependent child under Welfare and Institutions Code section 300[1] and removing him from his parents' custody. In a writ petition, father challenges the juvenile court's order terminating reunification services and setting a permanency hearing under section 366.26 for the parents' six older children. We conclude that the juvenile court's findings are supported by substantial evidence. We affirm the orders and deny father's petition.

### FACTUAL AND PROCEDURAL SUMMARY

The seven children subject to these proceedings are parents' daughter A.H. (born in 2003) and her six brothers: Wi.H. (born in 2004), B.H. (born in 2006), J.H. (born in 2008), Wa.H. (born in 2009), E.H. (born in 2010), and S.H. (born in 2012). We

---

[1] All statutory references are to the Welfare and Institutions Code.

previously reviewed the family's involvement with the Department of Children and Family Services (DCFS) in *Jeffrey H. v. Superior Court* (June 13, 2006, B189786 [nonpub. opn.]) and *In re B.H.* (July 31, 2009, B211691 [nonpub. opn.]).

Most recently, we recapitulated the family's long dependency history in *In re A.H.* (July 20, 2012, B236022 [nonpub. opn.]). As we explained there, in 1998, "mother's son from a prior marriage was subject to a dependency case in Orange County. Father, who was mother's companion at the time, was convicted of willful cruelty to the child, and mother failed to reunite. In 2005, the juvenile court sustained a petition as to A.H. and Wi.H. based on father's earlier abuse of their half sibling. During the pendency of the case, the parents abducted the children to Nevada. The case was closed in 2007 after the parents complied with all court orders. In 2008, a petition was sustained as to the four oldest children, based on the parents' failure to treat B.H.'s anemia. We affirmed the findings as to B.H. and reversed as to his siblings. The case was closed over DCFS's objection in January 2010."

The current case began in 2011, when the juvenile court sustained a section 300 petition as to the six older children, based on allegations father gave A.H. a black eye by hitting her with his fist, mother failed to protect her, and both parents regularly gave her beer to drink. The children were placed with a family friend, mother was allowed to move into the caregiver's home, and father was given monitored visits. The parents were ordered to receive reunification services, parenting education, and individual counseling; in addition, father was ordered to undergo anger management therapy. In *In re A.H.*, we affirmed the juvenile court's August 25, 2011 jurisdictional and dispositional order.

In October 2011, the caregiver requested that the children be removed from her home because the parents had "become increasingly hostile," and she feared for her own and her family's safety. The children were split up among three foster homes. In early 2012, the social worker assigned to the case obtained a restraining order against father, who had posted prayers for the social worker's death on YouTube and Facebook. Father also had posted unfounded accusations that the foster parents sexually, physically, and emotionally abused his children. Based on these postings, father's volatile temper, and

3

evidence he was present during mother's unmonitored visits, DCFS filed a section 388 petition, requesting that father be ordered to submit to a psychological evaluation, that his visits be suspended, and that mother's visits be monitored. The court ordered a psychological evaluation and professionally monitored visits for father. Mother's visits also were to be monitored, but DCFS was directed to assess the Hope Gardens Family Center, a homeless facility at which mother had lived since December 2011, for possible liberalization of her visits and placing the children with her there.

In April 2012, a court-appointed evaluator found father to be cooperative and not severely mentally ill, but "very likely" to have "a significant personality disorder, most likely with angry and paranoid features" that would require long-term therapy with a "seasoned professional." In May 2012, mother left Hope Gardens and went to live with a friend. Father's residence, after he left the Union Rescue Mission, was unknown, but he had been seen leaving mother's home, and mother's address was his only contact address.

The parents' seventh child, S.H., was born in July 2012. The parents refused to allow DCFS access to and information about the child without a warrant, refused to attend a team decision making meeting, and refused to sign a voluntary family maintenance contract with DCFS. The child was removed and a section 300 petition was filed on his behalf. The parents were disruptive during the ensuing court proceedings and had to be repeatedly excluded from the courtroom. On October 25, the court sustained counts b-4, j-1, j-2, and j-3 of DCFS's first amended petition filed on September 27. On November 14, S.H. was declared a dependent of the court and removed from the parents. The parents were ordered to undergo individual counseling, and granted monitored visitation rights.

The parents appealed the October 25 and November 14 orders in case No. B245942. DCFS cross-appealed the court's refusal to allow DCFS to further amend its first amended petition and the dismissal of additional counts. It has since abandoned the cross-appeal.

The 18-month hearing in the case of the six older children, originally set for November 2012, was not completed until March 2013. For the November hearing, the

4

social worker reported father had refused to receive any communication from DCFS, and DCFS had no information about the parents' participation in services. The parents' visits with all seven children were monitored. DCFS recommended that reunification services be terminated.

In February 2013, the new social worker assigned to the case learned mother and father were in individual counseling. Father's therapist reported she had seen father six times since the beginning of January. The sessions focused on father's feelings about the children's removal, his anger triggers, and management of stressful situations. Mother's therapist reported mother had received weekly therapy since November 2012. On March 5, 2013, the parents attended a team decision meeting, at which a safety plan was created. The plan provided that the children would remain as currently placed, DCFS would consider unmonitored visits, the parents would continue to participate in individual counseling, and the parties would explore a family preservation plan. Father signed the safety plan, but mother did not. The parents' visits were liberalized to unmonitored and were to take place at "the mother's home." Father immediately moved in with mother.

On March 8, 2013, 23 months after the removal of the six older children, the court terminated reunification services, but did not return the children to the parents' custody. The court's concerns were over father's disruptive behavior through most of the case and mother's continued submissiveness to his control, which indicated the parents had not made sufficient progress despite their recent attempts at compliance. Specifically, the court pointed out that although mother was further along the path of reunification with the children, she had not shown she could function independently of father. The court set the matter for a permanency hearing but invited mother to file a section 388 petition if her circumstances changed.

Father filed a writ petition from the March 8, 2013 order in case No. B248323. Mother did not. We consolidated the parents' appeal with father's writ proceeding.

5

I

In the appeal, the parents challenge the dependency court's jurisdictional and dispositional findings with regard to their youngest child, S.H. These findings are reviewed for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574.) The juvenile court's determination will not be disturbed unless it exceeds the bounds of reason. (*Id.* at p. 575.)

*A. Jurisdiction*

DCFS concedes that no substantial evidence supports count b-4, which was based on allegations that the parents refused to allow DCFS access to S.H. without a warrant. DCFS also concedes count j-2 should be stricken. It alleged father had a history of alcohol abuse. The allegation was not found true with respect to S.H.'s older siblings, and no other evidence in the record supports it. We do not consider these two counts any further.

DCFS contends the remaining two counts, j-1 and j-3, were supported by substantial evidence. These counts were based on the sustained allegations in the older siblings' open case, which we affirmed in *In re A.H.* Section 300, subdivision (j), allows the juvenile court to assert jurisdiction over a minor and declare the minor a dependent child of the court where "[t]he child's sibling has been abused or neglected, . . . and there is substantial risk that the child will be abused or neglected . . . ." The parents concede they are estopped from relitigating the first prong, which is satisfied by the jurisdictional findings in the older siblings' case. (*In re Joshua J.* (1995) 39 Cal.App.4th 984, 993.) But they argue the second prong was not established because there were no recent incidents of father's violence directed at any of his children, and the parents had complied with the case plan for S.H.'s siblings.

We review each parent's claim separately. The parents' appeal is from the October 25 and November 14, 2012 orders as to S.H. Although the appeal has been consolidated with father's writ petition that challenges the March 8, 2013 order terminating reunification services, we decline to consider evidence postdating the 2012

6

orders subject to the appeal.  That evidence was not before the court at the time it made the 2012 orders.  (See *In re Zeth S.* (2003) 31 Cal.4th 396, 407; *In re Robert A.* (2007) 147 Cal.App.4th 982, 990.)

We also decline to consider DCFS's last minute information filed on October 11, 2012, where the social worker reported receiving a referral that father had circumcised S.H., causing deformation to the child's penis.  The record does not indicate that these allegations were ever confirmed.

*1. Father*

Father focuses on the monitors' positive evaluations of his visits with the children, his two parenting courses and court-ordered psychological evaluation, and his involvement in mental health therapy.  The record indicates that, due to his belligerent conduct in this case, father had not progressed past monitored visits with his children.  Additionally, because he refused to communicate with DCFS in October and November 2012, when the orders as to S.H. were made, there was no evidence father was engaged in any mental health therapy even though the court-appointed evaluator had recommended such therapy.

Father completed a four-hour online parenting course in October 2011.  Reluctantly and at the social worker's insistence, he completed a 12-hour online advanced parenting class in January 2012.  He attended individual therapy, parenting classes and anger management classes while residing at the Union Rescue Mission between October 2011 and February 2012.  There was no evidence he completed these programs, and his therapist indicated she would recommend that he receive services through a forensic psychologist, as his case appeared to be "very complicated."  That father did not make substantive progress in these programs is evidenced by the fact that in early 2012 father showed very little concern about his children's privacy or psychological well-being.  He often lost his temper when criticized by the social worker during visitations.  He also made scandalous, and apparently unfounded, public allegations that his daughter was sexually abused at her foster home and that one of her brothers was being forced to sexually abuse her.

7

The evaluator's conclusion in May 2012 that father did not represent a significant danger was based on the premise that father had no known history of assaults and aggression. That premise was incorrect in light of father's 1998 conviction of child cruelty and the sustained allegation in the siblings' case that he struck his daughter with a fist, giving her a black eye. With the caveat that he could not diagnose father based on one meeting, the evaluator nevertheless ventured that father was very likely to have a personality disorder with angry and paranoid features that would require long-term therapy with a seasoned professional. There is no evidence that by the fall of 2012 father had received any such therapy. The evidence indicates rather that he refused to communicate with DCFS, to the detriment of his own position in this case.

2. *Mother*

A recurrent sustained allegation against mother throughout the family's dependency history has been her failure to protect her children from father's physical abuse. To the extent she argues father did not pose a danger to S.H. because he was complying with the case plan in the siblings' case, mother's argument is coextensive with father's and fails for the same reasons.

With regard to her own compliance, the record indicates that mother completed two online parenting classes and was enrolled in individual counseling between November 2011 and May 2012 at the latest, while she lived at Union Rescue Mission and Hope Gardens. A letter from Hope Gardens dated March 1, 2012, stated she had attended six sessions and demonstrated a positive and purposeful attitude. Mother left Hope Gardens in May 2012 and did not resume therapy until November 2012, after S.H.'s jurisdictional hearing. At the time of that hearing, there was no evidence that mother had successfully completed therapy and was in compliance with her case plan.

Mother's unmonitored visits with her children were conditioned on her remaining in Hope Gardens because it was a locked facility to which father did not have access. Mother left the facility allegedly because she was required to pay minimal rent if she lived there without her children. Mother claimed she could not to take advantage of payment options based on General Relief distributions because she had renounced her

8

United States citizenship. When mother left the facility, her visits became monitored. The social worker liberalized visitation in July 2012, but almost immediately DCFS received reports that father was seen at mother's residence when children were dropped off for unmonitored visitation. As a result, in September 2012, the court ordered that both parents' visits be monitored. Thus, at the time the court made the orders as to S.H., mother had lost her right to have unmonitored visits with his siblings. In taking jurisdiction over S.H. and removing him from mother's custody, the court specifically noted that mother had failed to remain independent of father.

Mother argues DCFS bore the burden of proving the jurisdictional issues by preponderance of the evidence. Whether the parents were in compliance with their case plan in the siblings' case was directly relevant to that issue since the purpose of the plan was to overcome the problems that led to the siblings' removal in the first place. (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.) A parent's compliance with a case plan is measured by the regularity with which the parent participates in treatment, the parent's efforts or progress, and the extent to which the parent "'cooperated and availed himself or herself of services provided.'" (*Ibid*., citing § 366.22, subd. (a).) The parents' erratic behavior, refusal to communicate with DCFS, and irregular participation in treatment programs was evidence that return of S.H.'s siblings to their custody would be detrimental. (§ 366.21, subd. (e).) Under the circumstances, the court acted reasonably in the exercise of jurisdiction over S.H.

*B. Disposition*

The parents argue that substantial evidence did not support S.H.'s removal from their custody. "Even though children may be dependents of the juvenile court, they shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being and there are no 'reasonable means' by which the child can be protected without removal. [Citation.]" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 528, citing § 361, subd. (c).) The agency's

9

burden of proof at the dispositional stage is higher than at the jurisdictional stage if the minor is to be removed from the parents' custody. (*Id*. at pp. 528–529.)

In its ruling on disposition, the court noted that whether father was a custodial parent was unclear. We need not decide this issue since father supported an order placing S.H. with mother and did not argue that the child should be placed with him. We note, however, that if father was in fact living with mother at the time of the disposition order, mother would not have been in compliance with her case plan. The court repeatedly conditioned return of S.H.'s siblings to mother on her not living with father because of her inability to control him and her tendency to follow his erratic behavior.

Mother argues the court improperly removed S.H. from her custody in order to pressure mother to comply with DCFS supervision. She relies on *In re Henry V.*, *supra*, 119 Cal.App.4th 522. In that case, a child was removed from his home after a single incident of burn marks on his behind. The appellate court reversed, reasoning there was "ample evidence" that in-home bonding services and supervision could have been provided in the family home, and the mother had fully cooperated. (*Id*. at p. 529.) In that context, the court noted that the "mother's fundamental right to the custody of her child is not a bargaining chip" to secure her future cooperation. (*Id*. at p. 530.) Mother also relies on *In re Steve W.* (1990) 217 Cal.App.3d 10. There, a court order removing a child from his mother's custody was reversed because there was no evidence the mother would allow the child's abusive father access to the child or that she would not comply with the court's orders. (*Id*. at pp. 22–23.)

Neither case involves parents who are non-compliant with an already existing case plan. At the time of S.H.'s removal, there was ample evidence that mother could not be trusted to comply with the court's orders or to stay away from father. The parents' contentious relationship with DCFS also made it unlikely that in-home services were an option. It would have been illogical for the court to keep S.H. with the parents after finding the parents had not resolved the issues that required the removal of S.H.'s older siblings.

The court's findings were supported by substantial evidence and its removal of S.H. was within the bounds of reason.

II

In his writ petition, father argues that at the 18-month review hearing on March 8, 2013, the court should have returned the six older children to him.

At an 18-month review hearing, a child must be returned to the parents unless the return would be detrimental to the child. (*Blanca P. v. Superior Court*, *supra*, 45 Cal.App.4th at p. 1748, citing § 366.22.) In deciding whether to return the child, the court must consider each parent's compliance with the case plan, participation in treatment programs, effort and progress, cooperation and availment of services. (*Ibid*.) We review the record for substantial evidence whether a child would be at substantial risk of detriment if returned to the parent's custody. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.)

As we have discussed, in November 2012 father was not in compliance with the case plan. The question is whether his circumstances had sufficiently changed by March 8, 2013. Father had been in individual counseling with a therapist since January 2013. He finally was addressing his feelings about his children's removal and his anger triggers, as well as learning how to manage his emotions and how to react in stressful situations. We disagree with DCFS's suggestion that father had the burden of establishing the therapist's qualifications since the social worker who spoke with the therapist could easily have inquired about her credentials. But we agree that the record does not indicate what substantive progress father had made in therapy. The court was not required to return the children to father without some showing of such progress.

Father had just had his first unmonitored visit two days before the March 8, 2013 hearing, as part of a safety plan he signed at a team decision meeting with DCFS. DCFS's willingness to liberalize father's visits after months, if not years, of conflict shows its recognition that father had made some progress in the right direction. However, the court was properly concerned that father unreasonably mistook the safety plan, which provided for unmonitored visits at "the mother's home," as permission to

11

move in with mother.  Moreover, father's decision to cooperate with DCFS was new, as was his resolve to sit through a court hearing without causing a disturbance.  We disagree with father's argument that his long history of disruptive, aggressive, and at times irrational behavior was irrelevant just because it was directed at the court and DCFS, rather than at the children.  It was not unreasonable for the court to refuse to return the children to his custody when deputy sheriffs were still present in the courtroom because father was considered a safety risk.

Father may file a section 388 petition if his circumstances change.

## DISPOSITION

The orders are affirmed.  Father's petition is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.